UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

PIERRE ARTY,

                Plaintiff,

      -v-

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION, ALAN AVILES, AND JORGE
PETIT,

                Defendants.

------------------------------------------------------------------X

| USDC SDNY |
|---|
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: DEC 0 3 2013 |

09 Civ. 05982 (AJN)

<u>MEMORANDUM &</u>
<u>ORDER</u>

ALISON J. NATHAN, District Judge:

      This case arises from Plaintiff Dr. Pierre Arty's employment as the senior administrator

in charge of the Behavior Health Division ("BHD") at Kings County Hospital Center ("KCHC"),

which is operated by the New York City Health and Hospitals Corporation ("HHC"). Plaintiff

brings claims against Defendants HHC, HHC Chief Executive Officer Alan Aviles, and HHC

consultant Dr. Jorge Petit. Plaintiff alleges that HHC unlawfully discriminated against him on

the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et

seq.*; the New York Sate Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*; and

the New York City Human Rights Law ("NYCHRL"), N.Y. Admin. Code § 8-107; and that Petit

unlawfully discriminated against him on the basis of race in violation of NYSHRL and

NYCHRL. In addition, Plaintiff alleges that he was unlawfully defamed by Defendants HHC

and Aviles following his termination.

      Defendants filed this motion for summary judgment on March 7, 2013. Dkt. No. 28. For

the reasons that follow, the motion is granted with respect to the Title VII, NYSHRL, and

NYCHRL claims, and the Court declines to exercise supplemental jurisdiction over the supplemental defamation claim.

## I. LEGAL STANDARD

"Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, 'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Anyanwu v. City of New York*, No. 10-cv-8398, 2013 WL 5193990, at *1 (S.D.N.Y. Sept. 16, 2013) (quoting Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).  For purposes of summary judgment, there is a genuine issue of material fact if a reasonable factfinder could decide in the non-moving party's favor. *See Nabisco*, 220 F.3d at 45.

The burden is generally on the moving party to demonstrate that there is no genuine issue of any material fact. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994).  When the burden of proof at trial would fall on the non-moving party, however, the moving party may meet its burden by "point[ing] to a lack of evidence. . . on an essential element" of the non-moving party's claim. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

If the moving party shows that there is no genuine issue of material fact, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  In doing so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.*

(citations omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586 (1986); and *FDIC v. Great Am. Ins. Co.,* 607 F.3d 288, 292 (2d Cir. 2010)).

## II. BACKGROUND

Unless otherwise indicated, the following facts are undisputed or taken in the light most

favorable to Plaintiff.

### A. Parties

Plaintiff is a Caribbean-American and a licensed physician. Compl., Profeta Decl., Ex. 1

¶ 8. He was the Deputy Executive Director of the BHD, KCHC's psychiatric services

department, from approximately July 2004 until his termination in June 2008. *See id.* ¶ 2.

Defendant HHC is a non-profit entity that "provides medical, mental health and

substance abuse services" through its facilities in New York City, which include KCHC.

Compl., Profeta Decl., Ex. 1 ¶ 9. Defendant Alan Aviles ("Aviles") is the President and Chief

Executive Officer of HHC. Compl., Profeta Decl., ¶ 11. Defendant Jorge Petit ("Petit") is a

consultant who was retained by Defendant Aviles in or around January 2008. Compl., Profeta

Decl., Ex. 1 ¶ 13. He belongs to a different race than Plaintiff. *See* Petit Decl (alleging Petit to

be Hispanic); Compl., Profeta Decl., Ex. 1 ¶ 13 (alleging Petit to be Caucasian).

### B. Structure of BHD Prior to Changes Instituted by Petit

Plaintiff joined KCHC as an attending physician in 1998, and he became the Deputy

Executive Director of the BHD, KCHC's psychiatric services department, in or around July

2004. Compl., Profeta Decl., Ex. 1 ¶ 12. As Deputy Executive Director, he reported directly to

KCHC Executive Director Jean Leon, who is also black. Def. 56.1 Statement ¶ 10. For four

years thereafter, Plaintiff consistently received positive performance evaluations for his work

running the BHD, which was "a large, complex and severely under-funded division of the chronically overcrowded and under-funded KCHC." Compl., Profeta Decl., Ex. 1 ¶ 12.

During Plaintiff's tenure as Deputy Executive Director, and prior to the events that are the subject of this action, Dr. David Dailey and Dr. Jill Bowen were senior administrators within the BHD who reported directly to Plaintiff. *See* Def. 56.1 Statement ¶¶ 14-16. As Chief of Service for psychiatry, Dr. Dailey was responsible for managing psychiatrists and handling issues such as "staffing, salaries, credentials, training and continuing medical education." *Id.* ¶ 15. As BHD Associate Director, Dr. Bowen "monitor[ed] the day to day affairs of those services that were under her." *Id.* ¶¶ 16, 5. Both Dr. Dailey and Dr. Bowen are white. *See* Petit Decl.

Plaintiff's duties included oversight of the Comprehensive Psychiatric Emergency Program ("CPEP"), the BHD's emergency psychiatric center. Def. 56.1 Statement ¶ 4. Its leadership team initially consisted of an administrative director, Mr. Oswald David, and a medical director, Dr. Joseph Charlot. *See* Def. 56.1 Statement ¶ 61; Pl. 56.1 Statement ¶ 63. Both Mr. David and Dr. Charlot are black. Petit Decl. Mr. David's responsibilities included, but were not limited to, "administratively ensuring that CPEP was running smoothly as far as patient safety and patients being seen," "making sure incidents in the CPEP were properly reported," as well as acting as the Assistant Director of Nursing for CPEP. Def. 56.1 Statement ¶¶ 62, 68; Pl. 56.1 Statement ¶ 62. Among Dr. Charlot's duties was acting as the Chief Psychiatrist of the CPEP Emergency Room. Def. 56.1 Statement ¶ 66; Pl. 56.1 Statement ¶ 66. Another member of the CPEP team was Dr. Scott Berger, a white man, who was the head of the CPEP Mobile Crisis Unit. Def. 56.1 Statement ¶ 70.

C. *Hirschfeld* Litigation and DOJ Investigation

4

In May 2007, the New York State Mental Hygiene Legal Service filed a class action suit, *Hirschfeld v. New York City Health and Hospitals Corp., et al.*, against the BHD, alleging pervasive neglect and abusive treatment of patients.  Def. 56.1 Statement ¶ 17.  Aviles, Ms. Leon, Dr. Daily, Dr. Charlot, and Mr. David were among the individual defendants named in that suit; Plaintiff, notwithstanding his title as Deputy Executive Director of BHD, was not.  Pl. 56.1 Statement ¶ 17.  The lawsuit described the CPEP and inpatient unit at BHD as "a chamber of filth, decay, indifference and danger."  *Id.*  While Plaintiff considered the allegations of the lawsuit to be untrue, Plaintiff found the lawsuit concerning.  Def. 56.1 Statement ¶ 18.  At some point during the latter half of 2007, DOJ indicated that it was interested in conducting an investigation of BHD.  *Id.* ¶ 28.

Following the filing of *Hirschfeld*, Aviles and Dr. Ramanathan Raju, the Chief Medical Officer of HHC, toured the CPEP and inpatient units of BHD with Ms. Leon.  Def. 56.1 Statement ¶ 19.  Aviles and Dr. Raju found the CPEP to be busy and "basically clean and relatively orderly."  *Id.* ¶ 20.  In a conversation with Defendant Aviles, Ms. Leon indicated that she, like Plaintiff, considered the suit's allegations to be inaccurate.  *Id.* ¶ 21.

As Deputy Executive Director, Plaintiff worked with Ms. Leon and engaged in initiatives to improve the BHD, both before and after *Hirschfeld* was filed.  *See* Pl. 56.1 Statement ¶ 22.  For example, in February 2007 (three months prior to the filing of *Hirschfeld*), Plaintiff agreed to undertake a "Unity Initiative" to improve the relationship between Hospital Police and CPEP staff, and "to educate Hospital Police to appreciate that patients had real mental illness and to take that into consideration in dealing with them."  Def. 56.1 Statement ¶ 22.  The conduct of Hospital Police in the CPEP had been recognized as an issue prior to the filing of *Hirschfeld*, and

was identified as a problem in one paragraph of the *Hirschfeld* complaint.  *See* Pl. 56.1 Statement ¶¶ 23-24.

In addition, Plaintiff was in regular communication with Ms. Leon regarding the management of BHD.  In July 2007, for example, Plaintiff wrote a memo to Ms. Leon reporting on efforts to encourage staff to take ownership of their departments and care about their work. Def. 56.1 Statement ¶ 25; Pl. 56.1 Statement ¶ 25.  Many of the concerns that Plaintiff worked to address—such as BHD culture, Hospital Police relations, underfunding and under-staffing issues—had been identified as problem areas long before *Hirschfeld* was filed, and some were known even before Plaintiff had been hired as Deputy Executive Director.  *See* Def. 56.1 Statement ¶ 27; Pl. 56.1 Statement ¶¶ 27, 29.

### D. Hiring of Jorge Petit

At some point prior to January 2008, the decision was made to hire a consultant to manage the additional workload created by the *Hirschfeld* litigation and resulting DOJ investigation.  Def. 56.1 Statement ¶¶ 30-31; Pl. 56.1 Statement ¶ 30.  The need for outside help was a product of the volume of work involved and did not necessarily reflect Plaintiff's performance as Deputy Executive Director.  *See* Pl. 56.1 Statement ¶ 30.  Indeed, the consultant who was eventually hired stayed on after Plaintiff was formally terminated and replaced by a new Deputy Executive Director. *Id.*

Petit was hired in or around January 2008, purportedly to assist Plaintiff and Ms. Leon with the *Hirschfeld* litigation and the DOJ investigation, and to act as a liaison to the HHC Office of Legal Affairs and the lawyers defending HHC.  Compl., Profeta Decl., Ex 1 ¶ 13; Def. 56.1 Statement ¶ 32.  In this capacity, Petit reported to Joyce Wale, Senior Assistant Vice President in charge of the HHC Office of Behavioral Health, and met regularly with Ms. Leon to apprise her

of developments in BHD.  *See* Def. 56.1 Statement ¶ 29; Pl. 56.1 Statement 32.  Plaintiff

understood that, given the impending DOJ investigation and media interest in the *Hirschfeld*

allegations, it was important to make improvements to the BHD as quickly as possible.  Def.

56.1 Statement ¶¶ 34-35.

From the outset, however, Petit exerted an independent authority within the BHD that

Plaintiff believed exceeded the scope of the litigation and investigation.  Pl. 56.1 Statement ¶ 38.

Petit, for example, began to address the long-standing and well-known underfunding and under-

staffing issues that had plagued BHD since long before the filing of *Hirschfeld*, and that Plaintiff

had been working to redress.  *Id.* ¶ 39-41.  Petit also began initiatives to improve incident

reporting and investigation, linen supply tracking, Hospital Police management, the

consolidation of existing policies and procedures, and data tracking—all problem areas that had

been identified prior to *Hirschfeld*, and that Plaintiff therefore considered to be outside the scope

of Petit's responsibilities. *Id.* ¶¶ 42-52.

### E. Formal Expansion of Petit's Role and Subsequent Changes to BHD

In March 2008, Petit's growing role within the BHD was formalized, and he was given

the management authority to make changes throughout the BHD, and particularly in the CPEP

and inpatient units, effectively displacing Plaintiff as Deputy Executive Director.  Def. 56.1

Statement ¶¶ 56, 58; Pl. 56.1 Statement ¶ 56.  Although Plaintiff remained the titular Deputy

Executive Director of BHD, Petit began giving Plaintiff assignments "in the chemical

dependency area" no later than March 2008.  Pl. 56.1 Statement ¶ 56.  Petit in turn reported to a

Senior Leadership Committee that included the lawyers defending against *Hirschfeld* and

responding to DOJ, as well as various senior managers from KCHC and HHC.  Def. 56.1

Statement ¶ 59.  At some point around this time, DOJ split its investigation in two, scheduling a

May 2008 inspection focused on matters involving environment of care, fire and life safety, and

hospital police, and a July 2008 inspection focused on clinical care. *Id.* ¶ 60.

Petit was dissatisfied with the CPEP, which he felt lacked an "overarching organizational

structure where there was clear accountability," notwithstanding the fact that there was an

existing leadership team in Dr. Charlot and Mr. David. Def. 56.1 Statement ¶ 63; Pl. 56.1

Statement ¶ 63. Conditions in the CPEP, moreover, were one of the major areas of concern

identified by the *Hirschfeld* litigation, *see* Profeta Decl., Ex. 5 ¶¶ 1-7 (describing conditions in

the CPEP as "shameful," "crowded, loud, putrid, poorly ventilated," etc.), and the DOJ and

*Hirschfeld* plaintiffs at some point voiced concerns about the CPEP's leadership and

organizational structure, *see* Def. 56.1 Statement ¶ 64; Pl. 56.1 Statement ¶ 64 (disputing the

timing that these concerns were voiced, and asserting that they did not cause Petit to reorganize

Petit, but not disputing that such complaints were made). In April 2008, Petit created two new

positions for leaders accountable for all of CPEP: Director of the CPEP, and Assistant Director

of the CPEP. *Id.* ¶ 65. Petit selected Dr. Scott Berger and Dr. Kristin Baumann, who are both

white, to fill these newly created leadership positions, effectively displacing the previously

existing leadership team of Dr. Charlot and Mr. David, who are both black. *Id.* ¶ 69; Pl. 56.1

Statement ¶ 64. Dr. Charlot remained in the CPEP as the Chief Psychiatrist of the Emergency

Room. Def. 56.1 Statement ¶ 66. Mr. David was laterally transferred to the inpatient unit,

maintaining the same civil service title (Assistant Director of Nursing), salary, and position. *Id.*

¶ 67. Within the CPEP, Mr. David's old Assistant Director of Nursing functions were assumed

by Fritzie Pascal, who is also black. *Id.* ¶ 68.

As of March 2008, Elsa Bush, who is black, reported to Plaintiff as the Senior Associate

Director of Regulatory Affairs for the BHD, and her responsibilities included quality

8

improvement, regulatory issues, and incident reporting. Def. 56.1 Statement ¶ 74. In March 2008, Petit requested information regarding February incident reports for the lawyers defending the HHC in the *Hirschfeld* litigation. *Id.* ¶ 75. The information that Ms. Bush provided in response to this request, however, was miscoded. *Id.* ¶ 75. Although the miscoded information did not leave the internal HHC legal team, and the problem was resolved within a few days, Petit considered this a serious error that cast himself and the BHD in a poor light. *Id.* ¶ 76-77; Pl. 56.1 Statement ¶ 77. Plaintiff considered Ms. Bush's misstep a "cause for concern" but felt that it was, overall, "minor, internal," and "related to Petit's concern that his performance might appear slipshod" to others within HHC. Pl. 56.1 Statement ¶ 77. As a result of the miscoding incident, Ms. Bush and her subordinate Hesham Shaaban, who is Middle-Eastern, were laterally transferred within KCHC. Def. 56.1 Statement ¶¶ 81-83.

In early April 2008, Petit assembled his own BHD management team including Plaintiff as well as specially selected senior staff from across KCHC. Def. 56.1 Statement ¶ 84. Petit transferred in several new managers, including Pearl John-Stiell, Patricia LaRode, Michele Moe, Phil Romain, Linda Dehart, and Veronika Hunko. *Id.* ¶ 85. Ms. John-Stiell, Ms. LaRode, Ms. Moe, Mr. Romain, and Ms. Dehart are black. Petit. Decl. Ms. Hunko, who is white, took over Ms. Bush's duties. *Id.* ¶ 88. Petit was given additional resources to support his new team, which had not been available to Plaintiff when he had been acting leader of BHD. Pl. 56.1 Statement ¶ 86. This new team's responsibilities were not limited to handling the *Hirschfeld* litigation and related investigation, but also included management responsibility for the entire BHD. *Id.* 90.

Plaintiff resented and was humiliated by Petit's takeover of the BHD, but he never expressed these feelings to Petit. Def. 56.1 Statement ¶ 94. He felt that the dramatic changes to the BHD organizational structure confused the lines of authority at BHD. Pl. 56.1 Statement

9

¶ 95. Plaintiff complained to Ms. Leon about Petit's "limiting meetings that [Plaintiff] could attend, directing him not to attend executive management meetings or meet one-on-one with Ms. Leon, and limiting [his] role to the work Petit assigned him." *Id.* ¶ 98. Ms. Leon told Plaintiff to "bear with it at this present time," and indicated that she would discuss Plaintiff's concerns with Aviles. *Id.* ¶ 99; Def. 56.1 Statement ¶ 99. Plaintiff also began an effort to arrange a meeting with Dr. Raju to express his concerns about Petit's conduct; this effort, however, was cut short by the death of a patient named Esmin Green on June 19, 2008, which is discussed more fully below, and Plaintiff's subsequent termination. *Id.* ¶ 100.

Petit, meanwhile, was sometimes frustrated with Plaintiff and complained to Plaintiff about the quality of Plaintiff's work product and missed deadlines. Pl. 56.1 Statement ¶ 96. Petit, for example, complained that Plaintiff failed to complete two projects he considered to be "easily [sic] deliverables" prior to the DOJ inspection—even though he had not testified that the projects had such a deadline. *Id.* ¶ 97.

F. Death of Esmin Green

On June 19, 2008, a patient named Esmin Green died after lying on the floor of the CPEP waiting room for an extended period of time. Def. 56.1 Statement ¶ 102. Video surveillance footage showed that Ms. Green had been the victim of gross neglect by KCHC staff prior to her death—she had lain face-down on the floor in the sightline of seven CPEP nurses, psychiatrists, and security guards, none of whom had attempted to help her, for over an hour. *Id.* ¶ 103; Compl., Profeta Decl., Ex. 1 ¶ 19. A subsequent review, moreover, indicated that Ms. Green's medical records had been falsified in the wake of her death. Def. 56.1 Statement ¶ 104.

Petit met with Ms. Leon, Kathy Rones, Medical Director for KCHC, and George Proctor, on the morning of Ms. Green's death to discuss what had happened, including how to deal with

the surveillance video and the false medical records. Def. 56.1 Statement ¶ 103-04. Plaintiff, despite remaining the nominal Deputy Executive Director, was not included in the meeting. Pl. 56.1 Statement ¶ 103. After being informed of Ms. Green's death, Aviles notified the relevant government authorities, consulted with the General Counsel of HHC, directed that the surveillance tape be secured and handed over to the *Hirschfeld* plaintiffs. Def. 56.1 Statement ¶ 106. Ms. Rones was directed to handle the investigation. *Id.* ¶ 107.

G. Personnel Changes Following Esmin Green's Death

In the aftermath of Ms. Green's death, the nurses who had made fraudulent entries in medical records disguising their neglect of Ms. Green were suspended, and the attending doctor who failed to render care to Ms. Green, the Head of Hospital Police, and Plaintiff were terminated. Def. 56.1 Statement ¶¶ 108-09. Neither the Head of Hospital Police nor Plaintiff had had any direct involvement in Ms. Green's death. *Id.* ¶ 109. Aviles testified that the Head of Hospital Police had been fired to "send a message that leadership is accountable and in our system, hospital police tends to report up in a silo to the chief of hospital police." Pl. 56.1 Statement ¶ 110. No other CPEP manager was fired, disciplined, or investigated for the events leading to Ms. Green's death. *Id.* ¶ 115.

Ms. Wale testified that Plaintiff was terminated because he was Deputy Executive Director, but she also testified that Plaintiff was not fired because of Ms. Green's death. Pl. 56.1 Statement ¶¶ 113, 115. Aviles testified that the decision to terminate Plaintiff was meant in part to demonstrate "that our senior leaders are ultimately accountable for the culture in the areas that they are responsible for," and "to send a strong message of accountability with regard to a culture of patient safety as opposed to a culture of indifference." *Id.* ¶ 115. Aviles further indicated that he believed "it [had become] increasingly clear that [Plaintiff] seemed to be pretty

disengaged and not a strong and effective leader." *Id.* Aviles, Wale, Bowen, and Petit, however, also admitted that for several months prior to Ms. Green's death, Petit and not Plaintiff had been acting as leader of CPEP. Pl. 56.1 Statement ¶ 115. Plaintiff correctly notes that he is not cited for any wrongdoing in the New York City Department of Investigations report on Ms. Green's death, *id.*, but his termination is cited as an example of a "reform measure[] and corrective action[] implemented since the death of Esmin Green by KCHC," Def. Reply 56.1 Statement ¶ 14; Hernstadt Decl., Ex. 20, at 17.

Dr. Ann Sullivan, who is white, was initially selected to replace Plaintiff as Interim Director of BHD. Pl. 56.1 Statement ¶ 119. Petit remained a consultant at HHC, and his fees were in fact significantly increased. *Id.* ¶ 120. Following a complete search, Dr. Joseph Merlino, who is also white, was appointed Deputy Executive Director of the BHD. Def. 56.1 Statement ¶ 127.

### H. Public Statements Following Esmin Green's Death

Following Ms. Green's death, Aviles, Ms. Leon, and others at HHC made public statements indicating that those responsible for Ms. Green's death had been punished. Pl. 56.1 Statement ¶ 123. On July 1, 2008, Aviles sent a message to HHC staff that stated: "[w]e took immediate disciplinary action, including termination, against the staff who failed to go to the patient's aid, the nurse who falsified the chart, and certain senior managers," and described Ms. Green's death as a "shameful event – contrary to everything that we stand for." Compl., Profeta Decl., Ex. 1 ¶ 22(a). Ms. Leon echoed Aviles' sentiment in a letter sent to KCHC staff the same day, which stated: "it is apparent that some employees terribly and thoroughly failed to render appropriate care. Those employees have been disciplined through suspension or termination." *Id.* ¶ 22(b). On August 20, 2008, Aviles sent another message about the incident, stating: "[a]s

you know, disciplinary action has been taken against those who so callously neglected Esmin Green." *Id.* ¶ 22(c). As a consequence of these statements, New York newspapers reported that Dr. Arty had been terminated "because of the irresponsible conduct that caused Ms. Green's demise." *Id.* ¶ 23.

Aviles testified that the purpose of such statements was to communicate the message that senior leadership was being held accountable for the abominable behavior of the staff members who had so egregiously neglected Ms. Green. Def. Statement ¶ 122. The statements also served the purpose of protecting HHC's reputation by reminding the public that HHC had undertaken the work to improve HHC and that HHC leadership was terribly sorry about Ms. Green's death, and by showing that "there are some good things that still go on at KCHC." Pl. 56.1 Statement ¶ 122 (citing Hernstadt Decl., Ex. 3 at 149:8-24). According to Plaintiff, however, these statements further suggested that Plaintiff—who had been terminated in the wake of Ms. Green's death—was one of the individuals responsible for Ms. Green's death, even though he had no direct involvement in the incident. *Id.* ¶ 123.

## III. DISCRIMINATION CLAIM

### A. Legal Standard

Plaintiff alleges that he was discriminated against on the basis of his race in violation of Title VII, NYSHRL, and NYCHRL. The Court analyzes these claims under the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 216-17 (2d Cir. 2005) (analyzing Title VII, NYSHRL, and NYCHRL under the *McDonnell* framework). Under that framework, it is initially a plaintiff's burden to establish a *prima facie* case of intentional discrimination. Although the precise elements of this *prima facie* claim may vary depending on the factual

circumstances involved, *see McDonnell Douglas*, 411 U.S. at 802 n.13, a plaintiff may ordinarily meet his burden by showing: "(1) he belonged to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). At summary judgment, a plaintiff's initial burden is "minimal." *Graham v. Long Island Rail Road*, 230 F.3d 34, 38 (2d Cir. 2000).

If a plaintiff successfully establishes a *prima facie* case of intentional discrimination, a presumption of unlawful discrimination arises, and the burden shifts to the defendant to "come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2003); *see also McDonnell Douglas*, 411 U.S. at 802.

Once both parties have satisfied their initial burdens, "the plaintiff's ultimate burden of persuasion is the burden [he] bore from the outset—to persuade the trier of fact that [he] was the subject of illegal discrimination." *Holtz v. Rockefeller & Co., Inc*, 258 F.3d 62, 81 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000); *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). A plaintiff may accomplish this "by showing that the defendant's proffered reasons were pretextual or were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Anyanwu*, 2013 WL 5193990, at *11 (citing *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 455 (S.D.N.Y. 2012) (internal quotation marks omitted)).

### B. *Prima Facie* Case

In order to establish a *prima facie* case of unlawful discrimination and meet his burden under the first step of *McDonnell Douglas*, Plaintiff must show that (1) he is a member of a

14

protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that adverse action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d at 138 (2d Cir. 2003). For purposes of this motion, it is undisputed that Plaintiff is a member of a protected class and was qualified for the position of Deputy Executive Director, nor is it disputed that he suffered an adverse employment action when he was terminated. *See* Def. Br. 5. Defendants also do not dispute that Plaintiff was largely displaced as Deputy Executive Director in March 2008, following the formal expansion of Petit's role. *See* Reply Br. 5 (disputing only the reasoning behind the "great[] expan[sion] in Petit's role).

Defendants do contest whether Plaintiff has shown "that his termination occurred under circumstances giving rise to an inference of unlawful discrimination," arguing that Plaintiff's lawsuit "basically challeng[es] business decisions that were made after the filing of the *Hirschfeld* litigation triggered the scrutiny of DOJ and the resultant hiring of Petit." Def. Br. 5, 8. With respect to the fourth and final prong, however, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citing *Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir. 2000); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995)); *see* Pl. Opp. 9. Plaintiff has therefore sufficiently raised an inference of discrimination to make his *prima facie* case by alleging that he was effectively replaced by Petit, who is Hispanic or Caucasian, in March 2008, and formally replaced by Dr. Ann Sullivan, who is white, following his termination in June 2008. *See* Pl. 56.1 Statement ¶¶ 56, 119.

C. Legitimate Business Reason

15

Because Plaintiff has successfully established his *prima facie* case of intentional discrimination, the burden shifts to Defendants to produce "admissible evidence of legitimate nondiscriminatory reasons" for its decision to replace and subsequently terminate Plaintiff as Deputy Executive Director of the BHD. *Mandell*, 316 F.3d at 380. Defendant has met this burden by showing that, during Plaintiff's tenure as the titular Deputy Executive Director of the BHD, the BHD was the subject of the *Hirschfeld* litigation and resulting DOJ investigation, Def. Br. 8-9, and Ms. Green died in the CPEP following an extended period of neglect by BHD staff, Def. Br. 11-12.

### D. Whether Race Was a Motivating Factor

Because both Plaintiff and Defendants have met their initial burdens, the Court proceeds to the third step of the *McDonnell Douglas* framework. At this stage, Plaintiff's burden "is the burden [he] bore from the outset—to persuade the trier of fact that [he] was the subject of illegal discrimination." *Holtz*, 258 F.3d at 81 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000); *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). In other words, the Court must determine "whether, without the aid of the presumption, [Plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence" that the decision to displace and then terminate him was based, at least in part, on his race. *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008).

#### 1. Evidence of race as a motivating factor

In addition to the undisputed fact that Plaintiff's informal and formal replacements as Deputy Executive Director of the BHD—Petit, Dr. Sullivan, and Dr. Merlino—did not belong to

his suspect class,[1] Plaintiff raises three categories of evidence that he argues show he was discriminated against on the basis of race. First, he points to the replacement of "the senior leadership at [BHD] and CPEP who were black with white employees." Pl. Opp. 11-12. Second, he argues that black managers at the BHD were treated less favorably than white managers. Pl. Opp. 11-12. Third, Plaintiff argues that the circumstances surrounding his termination show that HHC's stated reason for his termination—"that he was responsible for [BHD] and CPEP"—was "false." Pl. Opp. 12.

### i. Replacement of black senior leaders with white employees

In support of his first argument, Plaintiff cites the removal of Dr. Charlot and Mr. David, who are both black, from the CPEP leadership team, as well as the transfer of Ms. Bush, who is black, out of the BHD. Pl. Opp. 11. Even construing the record in the light most favorable to Plaintiff, however, the circumstances surrounding these personnel changes do not raise an inference of race discrimination. The undisputed facts show that these three personnel changes occurred at or around the same time that Petit was reorganizing the entire BHD—as Plaintiff himself testified, Petit "was making changes throughout all of [the BHD] and specifically changes in the roles of everyone." Pl. 56.1 Statement ¶ 92. In the course of these changes, Petit transferred into the BHD Pearl John-Stiell, Patricia LaRode, Michele Moe, Phil Romain, Linda Dehart, and Veronica Hunko—all of whom but Ms. Hunko are, like Plaintiff, Dr. Charlot, Mr. David, and Ms. Bush, black. *See* Def. 56.1 Statement ¶ 85; Pl. 56.1 Statement ¶ 85 (admitting that the listed individuals were "among the individuals transferred to BHS to work under Petit");

---

[1] While this fact was sufficient to make a *prima facie* case of race discrimination under the first step of *McDonnell Douglas*, it is, under these circumstances, not on its own sufficient to meet Plaintiff's third-step burden. *See James v. N.Y. Racing Ass'n.*, 233 F.3d 149, 154 (2d Cir. 2000) (when determining whether the plaintiff has sustained his burden under the third step, "[t]he requirements of the *McDonnell Douglas* prima facie case are so minimal that they do not necessarily support any inference of discrimination").

17

Petit Decl. The probative value of the fact that all three of the "BHS employees identified in this case that Petit transferred away from his domain were. . . black," Pl. Opp. 11, is significantly reduced by the fact that five of the employees that Petit transferred *into* his domain were also black. In this context, the demotion or transfer of three black employees does not permit the inference that, as Plaintiff argues, Petit "was choosing among [the BHD's] then current staff and demoting or transferring the persons of color while promoting the white employees." Pl. Opp. 11.

Moreover, viewing the record in the light most favorable to Plaintiff, the underlying facts of the three transfers/demotions do not raise an inference of discrimination. Both Dr. Charlot and Mr. David retained many, if not all, of their previous responsibilities following their displacement as the leaders of the CPEP. Dr. Charlot remained in charge of the CPEP emergency room following the creation of the Director and Assistant Director positions. *See* Pl. 56.1 Statement ¶ 66. After Mr. David was transferred to the inpatient unit of the BHD, he maintained the same salary and title, and his Assistant Director of Nursing duties in the CPEP were assumed by Fritzie Pascal, a black woman. *See* Pl. 56.1 Statement ¶¶ 67-68.

Indeed, it is undisputed that Petit decided to transfer Ms. Bush because of a mistake that she made in relation to Petit's duties as liaison to the attorneys defending HHC in the *Hirschfeld* litigation. *See* Def. 56.1 Statement ¶¶ 75-77; Pl. 56.1 Statement ¶¶ 75-77 (disputing the nature of the mistake and its severity, but not that it was the cause of Ms. Bush's transfer). Even viewing the record in the light most favorable to Plaintiff and assuming for purposes of this motion that, as Plaintiff alleges, "the entire incident was minor, internal, related to Petit's concern that his performance might appear slipshod," the circumstances surrounding the transfer at most raise the inference that Petit was improperly motivated by petty concerns about his own appearance—and

not that he was motivated by Ms. Bush's race. Pl. 56.1 Statement ¶ 77; *see also id.* ¶ 75

(describing Ms. Bush's mistake as a "problem with respect to. . . above all, how Petit felt he

appeared to the HHC lawyers"). This is especially true in light of the undisputed fact that Ms.

Hunko, the white woman who replaced Ms. Bush, was brought in along with five other black

employees to serve as part of Petit's new management team. *See* Def. 56.1 Statement ¶ 85; Pl.

56.1 Statement ¶ 85.

### ii. Disparate treatment

Nor does the record, when viewed in the light most favorable to the Plaintiff, permit the

inference that white employees were treated more favorably than similarly situated black

employees. Here, Plaintiff argues that Defendants treated Dr. Berger and Dr. Baumann, who are

white, more favorably than the similarly situated Dr. Charlot and Mr. David, who are black. *See*

Pl. Opp. 11-12. Dr. Berger and Dr. Baumann, however, were not similarly situated to Dr.

Charlot and Mr. David. *See Anyanwu*, 2013 WL 5193990, at \*14 (drawing an inference of

discrimination from disparate treatment requires "a showing that the more favorably treated

employees were 'similarly situated' to the plaintiff in all material respects") (citing *Shumway v.*

*United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *Ruiz v. Cnty. of Rockland*, 609 F.3d

486, 494-95 (2d Cir. 2010); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-55 (2d Cir. 2001)).

All four employees occupied different positions within the BHD and held different

responsibilities: Dr. Berger had been Head of the CPEP Mobile Crisis Unit, Def. 56.1 Statement

¶ 70; Dr. Baumann had headed a BHD outpatient program, *id.* ¶ 72; Dr. Charlot was medical

director of the CPEP leadership team and Chief Psychiatrist of the CPEP emergency room, *id.*

¶¶ 61, 66; and Mr. David was administrative director of the CPEP leadership team and Assistant

Director of Nursing, *id.* ¶¶ 61-62, 67-68. As a consequence, they cannot serve as comparators to

one another for purposes of raising an inference of racial discrimination. *Cf. Shumway*, 118 F.3d at 64 (finding that employees were not similarly situated where they had different supervisors and engaged in misconduct of varying severity).

### iii. Plaintiff's termination

Plaintiff further argues that the sequence of events leading to his termination provide sufficient evidence that he was subjected to race discrimination. According to Plaintiff, following the June 2008 death of Ms. Green, he "was fired on the false premise that he was responsible for [BHD] and CPEP," notwithstanding the fact that Petit had effectively replaced Plaintiff as the Deputy Executive Director of CPEP in March 2008. Pl. Opp. 12. Reading the record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Plaintiff had indeed been replaced as the functional Deputy Executive Director several months prior to Ms. Green's death in June 2008, and that HHC's stated motivation for their decision, *i.e.* that Plaintiff was accountable for Ms. Green's death, was false or pretextual.

A reasonable factfinder could not, however, find that this record raises the inference that Plaintiff was terminated *because of his race*. As the Second Circuit has recognized, "there are so many reasons why employers give false reasons for an adverse employment action that evidence contradicting the employer's given reason—without more—does not necessarily give logical support to an inference of discrimination." *James v. N.Y. Racing Ass'n.*, 233 F.3d 149, 154 (2d Cir. 2000). In this case, as Plaintiff himself has stated, the evidence of falsity lends logical support to the inference that Plaintiff was terminated as part of "an effort to deflect responsibility and public outrage and whitewash HHC's having caused the underlying problems by years of underfunding and understaffing at KCHC," Pl. 56.1 Statement ¶ 122—not that he was terminated because he is black.

## 2. Evidence of other motivating factors

Finally, the evidence that Defendants initially replaced Plaintiff with Petit because of the allegations underlying the *Hirschfeld* litigation and DOJ investigation, and not because of Plaintiff's race, is overwhelming.  Plaintiff does not dispute that conditions in the BHD, and particularly in the CPEP, were a central concern in the ongoing *Hirschfeld* litigation.  *See* Def. 56.1 Statement ¶ 17 (citing Profeta Decl., Ex. 5 (describing CPEP emergency room and inpatient unit of BHD as "a chamber of filth, decay, indifference, and danger" and seeking to end pervasive neglect and abusive treatment in BHD)); Pl. 56.1 Statement ¶ 17 (admitting the Defendants' characterization of the *Hirschfeld* litigation to be true, referring the Court to the *Hirschfeld* complaint, and noting that Plaintiff was not "personally accused of liability" by the *Hirschfeld* plaintiffs).  Rather, Plaintiff disputes only whether these conditions were known to HHC prior to the filing of the *Hirschfeld* complaint.[2]  While Plaintiff's allegations do permit the inference that HHC was indifferent to conditions in the BHD prior to the *Hirschfeld* litigation, they do not raise any inference that HHC was indifferent to conditions in the BHD after the *Hirschfeld* litigation had been filed and the resulting DOJ litigation commenced.  The severity of the allegations made in *Hirschfeld*, as well as the negative attention those allegations drew from the DOJ and the media, provide ample evidence from which a reasonable finder of fact could

---

[2] For example, Plaintiff repeatedly asserts that issues identified in the *Hirschfeld* litigation—such as Hospital Police relations, patient safety, under-funding, and understaffing—were widely known prior to that litigation's commencement. *See, e.g.,* Pl. 56.1 Statement ¶¶ 23 ("[T]he issue with Hospital Police identified by Plaintiff. . . pre-dates and is independent of any issue raised by the *Hirschfeld* case"), 27 ("[C]oncern for the 'safety' of 'patients and staff' a concern at [BHD] that was not limited to his four years as DED"), 29 (denying that the under-staffing issue was identified for the first time by the *Hirschfeld* litigation and asserting that "senior staff. . . had heard and known for years that KCHC and BHS had suffered for years from chronic underfunding and chronic understaffing"), 41 ("[T]he scope and seriousness of the problems at KCHC were known to HHC long before *Hirschfeld* was filed.").

conclude that Plaintiff was replaced by Petit and subsequently terminated for reasons other than his race.

The undisputed facts also show that, just before Plaintiff's termination from his position as titular Deputy Executive Director of the BHD, Esmin Green died "after lying unattended for an extended period of time face down on the floor of the main waiting room of the CPEP of BHD," Def. 56.1 Statement ¶ 102, and that this incident involved extreme negligence and misconduct by several members of the BHD staff, *see* Def. 56.1 Statement ¶¶ 108 (doctor failed to render care to Ms. Green, several nurses falsified entries regarding their care of Ms. Green), 110 (security guards saw Ms. Green lying on the floor without coming to her aid); Pl. 56.1 Statement ¶ 108, 110 (not disputing those facts). As previously discussed, Plaintiff denies that he was culpable for Ms. Green's death and forcefully argues that he was made into HHC's scapegoat. *See* Pl. Opp. 12; Pl. 56.1 Statement. Even accepting Plaintiff's facts as true, this event nevertheless provides ample evidence that Plaintiff was discriminated for reasons other than his race.

### 3. Conclusion

Plaintiff has produced no evidence from which a reasonable finder of fact could conclude he was discriminated against because of his race, other than the fact that his replacements as administrator in charge of the BHD were outside his protected class. While this circumstance was sufficient "for the required inference of discrimination at the *prima facie stage* of the Title VII analysis," *Zimmermann*, 251 F.3d at 381 (emphasis added), it is not sufficient to carry Plaintiff's third-step burden of "persuad[ing] the trier of fact that [he] was the subject of illegal discrimination," *Holtz*, 258 F.3d at 81. As the Second Circuit has recognized, "[t]he requirements of the *McDonnell Douglas* prima facie case are so minimal that they do not

necessarily support any inference of discrimination," and summary judgment may be granted

against a plaintiff who has "satisfied the minimal *McDonnell Douglas* standard for a prima facie

case and offered evidence that arguably would allow a reasonable factfinder to conclude" that the

proffered legitimate business reason is pretextual. *James v. N.Y. Racing Ass'n.*, 233 F.3d at 154,

157 (affirming the grant of a defendant's motion for summary judgment, notwithstanding the fact

that plaintiff had made a *prima facie* case and produced evidence of pretext).  To reiterate, the

relevant inquiry at this step of the analysis is not whether the plaintiff or the employer has met an

"arbitrary rule or presumption as to sufficiency," but rather whether an analysis of the "particular

evidence. . . reasonably supports an inference of the facts plaintiff must prove—particularly

discrimination." *Id.* at 156-57.

   "[T]he Second Circuit has found summary judgment appropriate where the plaintiff has

established only a minimal prima facie case and weak evidence that the employer's legitimate

explanation should be rejected in the face of abundant evidence that no discrimination occurred."

*Wolf v. N.Y. City Dept. of Educ*, 708 F. Supp. 2d 327, 331 (S.D.N.Y. 2010).  Based on the

absence of any evidence that Plaintiff was discriminated against because of his race, other than

the race of his replacements, and the magnitude of the evidence that Plaintiff was replaced and

terminated for other reasons, the Court finds that no reasonable finder of fact could conclude that

Plaintiff was the subject of illegal discrimination.  *Cf. James v. N.Y. Racing Ass'n*, 233 F.3d 149;

*Baguer v. Spanish Broad. Sys. Inc.*, No. 04 Civ. 8393, 2010 WL 2813632 (S.D.N.Y. July 12,

2010) (granting employer's motion for summary judgment, notwithstanding the fact that plaintiff

had made a *prima facie* case and produced some evidence supporting pretext, where "the record

taken as a whole cannot support an inference of discrimination").  Accordingly, Plaintiff has not

met his burden and summary judgment is granted as to his Title VII, NYSHRL, and NYCHRL claims against Defendants HHC and Petit.

## IV. DEFAMATION

Having granted summary judgment with respect to Plaintiff's Title VII claims, which are the only basis for original federal jurisdiction, the Court must determine whether to retain supplemental jurisdiction over Plaintiff's state-law claim of defamation. *See* 28 U.S.C. § 1367(c)(3). "The exercise of supplemental jurisdiction is within the sound discretion of the district court," based upon consideration of such factors as "the values of judicial economy, convenience, fairness, and comity." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117-18 (2d Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349-50 (1988)). While there is no "mandatory rule" requiring state claims to be dismissed when all federal claims have been dismissed before trial, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors. . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7. These factors will also typically favor the relinquishment of jurisdiction when "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Id.* (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)).

This is the usual case, and the balance of factors points toward relinquishment of jurisdiction over Plaintiff's remaining state-law claims: judicial economy, convenience, fairness, and comity are not served by the exercise of jurisdiction over Plaintiff's claim for defamation, which requires analysis of a separate body of law and fact. Accordingly, the Court declines to exercise supplemental jurisdiction over the defamation claim, and it is hereby dismissed without

prejudice. *Cf. Green v. City of New York Dept. of Corrections*, No. 06 Civ. 4978, 2008 WL 2485402, at *7 (S.D.N.Y. June 18, 2008).

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's Title VII, NYSHRL, and NYCHRL claims. Plaintiff's defamation claim is dismissed.

This resolves Docket No. 28. The Clerk of Court is requested to terminate this case.

SO ORDERED.

Dated: December ___, 2013

New York, New York

ALISON J. NATHAN

United States District Judge

25